**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**PRISCILLA FAYE HAYES,**

       **Plaintiff,**

**v.**                         **Case No.: 3:15-cv-00509**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for

judgment on the pleadings be **DENIED**; that the Commissioner's motion for judgment on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On February 5, 2013 and February 11, 2013, respectively, Plaintiff Priscilla Faye Hayes ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of April 13, 2012, (Tr. at 234, 235), due to "arthritis, syncope, depression, COPD [and] high blood pressure." (Tr. at 255). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 144, 153). Claimant then filed a request for an administrative hearing, which was held on July 8, 2014, before the Honorable Michele M. Kelley, Administrative Law Judge ("ALJ"). (Tr. at 54-91). By written decision dated August 1, 2014, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 12-25, 35-48). The ALJ's decision became the final decision of the Commissioner on November 19, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 55 years old at the time she filed the instant applications for benefits,

and 56 years old on the date of the ALJ's decision. (Tr. at 235). She has a high school education, with two additional years of college, and communicates in English. (Tr. at 256). Claimant has previously worked as an inventory clerk and shipping clerk. (Tr. at 61-63, 256).

## III.  <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d),

416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2017. (Tr. at 37, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since April 13, 2012, the date of Claimant's alleged disability onset. (Tr. at 37, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "osteoarthritis of the hip,

status-post left hip replacement, degenerative joint disease of the knees, degenerative changes of the lumbar spine, and chronic obstructive pulmonary disease." (Tr. at 37, Finding No. 3). The ALJ considered Claimant's alleged physical impairments of obesity, hypertension, thyroid problems, hyperlipidemia, restless leg syndrome, and gastroesophageal reflux disease (GERD), and found them to be non-severe. (Tr. at 38). The ALJ also considered Claimant's alleged mental impairments under the four broad functional categories set forth in the Social Security regulations, but found these impairments to be non-severe, as well. (Tr. at 38-39).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 39, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a limited range of light work as defined in 20 CFR § 404.1567(b) and 416.967(b) as follows: she can lift, carry, push and pull ten pounds frequently and twenty pounds occasionally; walk and stand six hours in an eight hour workday; sit six hours in an eight hour workday; frequently climb ramps, stairs and balance; and occasionally stoop; kneel, crouch or crawl. She should never climb ladders, ropes or scaffolds; should avoid concentrated exposure to extreme cold, humidity and vibration, fumes, odors, dusts, gases and poor ventilation; and should avoid all exposure to hazards such as unprotected heights, inherently dangerous machinery and uneven surfaces.

(Tr. at 39-45, Finding No. 5). At the fourth step, the ALJ found that Claimant was capable of performing past relevant work as an inventory clerk and shipping clerk, as those occupations were actually and generally performed. (Tr. at 45-47, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 47-48, Finding No. 7).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, she asserts that the ALJ erred at step two of the sequential evaluation process by determining that Claimant's mental impairment was non-severe. According to Claimant, the record establishes that her depression significantly limits her ability to perform basic work-related activities; therefore, it is a severe impairment. (ECT No. 10 at 7). Claimant complains that instead of relying on the records prepared by her treating physician in assessing the severity of her mental impairments, the ALJ improperly relied on opinions issued by non-examining sources and by a consultant who performed one examination. Claimant points out that her primary care physician detailed Claimant's depression, crying spells, and lack of desire to "do anything." Notwithstanding this evidence, the ALJ chose to ignore the medical records and instead focused entirely on Claimant's daily activities of living—particularly, her church activities—to support the ALJ's decision that Claimant's mental impairment was non-severe.

In her second challenge, Claimant argues that "the ALJ failed to accurately describe the Claimant and as a result the hypothetical to the vocational expert failed to accurately describe the Claimant." (*Id.* at 8). Claimant contends that even though the ALJ found that Claimant had severe impairments involving degenerative joint disease, hip replacement, and osteoarthritis of the hips, the ALJ determined that Claimant could perform light work, including standing for six hours, kneeling, climbing, crouching and crawling. Claimant maintains that the ALJ failed to include sufficient limitations in the RFC finding to account for Claimant's inability to bend, or sit for extended periods, or stand or walk for six hours in an eight-hour workday. (*Id.* at 8-9). In Claimant's view, the vocational expert's testimony was flawed and unreliable, because it was based on

hypothetical questions that failed to fully account for Claimant's functional deficits; namely, her significant limitations in bending, sitting, walking, and standing.

In response, the Commissioner argues that the ALJ's decision should be affirmed, because substantial evidence demonstrates that Claimant does not have a severe mental impairment. (ECF No. 11 at 13). The Commissioner emphasizes that, under Social Security regulations, a mental impairment is non-severe if the impairment does not significantly limit an individual's ability to do basic work activities. According to the Commissioner, an agency consultant, Dr. Green, examined Claimant and found only mild depressive symptoms. (*Id.*at 14). Dr. Green found no evidence that Claimant had problems with concentration or attention. In addition, Claimant's affect was appropriate; her speech was within normal limits; her thought process and content were unremarkable; and her memory was normal. The Commissioner further notes that the ALJ relied upon two additional opinions, provided by other psychological experts, Ellen Shapiro, Ph.D., and Mary Thompson, Ph.D, in assessing the severity of Claimant's mental impairments. Both experts similarly found that Claimant did not have a severe mental impairment. (*Id.*).

With respect to Claimant's second challenge, the Commissioner contends that the ALJ's RFC finding and hypothetical questions were well-supported by the evidence. (*Id.* at 11). The Commissioner points out that the ALJ did not believe that Claimant was entirely credible regarding the severity of her pain and resulting limitations. The ALJ noted that after Claimant had a hip replacement in 2011, she continued to work until taking a leave of absence and/or quitting her job or being laid off. The ALJ also observed that Claimant continued to smoke despite her complaints of shortness of breath. The Commissioner argues that Claimant's activities of daily living belie her allegations of

8

extreme pain and limitation. (*Id.* at 12-13). Considering the evidence, which reflects that Claimant attends church two to three times per week, lives alone, takes care of household chores and personal grooming, and fixes simple meals, the ALJ properly found that Claimant was not disabled.

## V.   <u>Relevant Medical History</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records prior to April 13, 2012 (Alleged Disability Onset)

On August 26, 2005, Claimant underwent a nuclear medicine thyroid scan with uptake at King's Daughters' Medical Center ("KDMC"). (Tr. at 357). Results indicated good uptake in the gland with two areas showing increased activity seen in the lower lobes most likely summation artifact. The scan was deemed normal with no definite focal abnormality. A few months later, on December 20, Claimant underwent a thyroid ultrasound at KDMC which revealed findings compatible with multinodular goiter. (Tr. at 352).

On January 11, 2006, Claimant presented to KDMC for a total thyroidectomy and nasopharyngoscopy. (Tr. at 380-381). Claimant reported taking Synthroid periodically for several years. She complained of hoarseness and a feeling of fullness in her neck. Claimant reported she smoked one pack of cigarettes a day. (Tr. at 380). On examination, she was alert, oriented, pleasant, and in no distress. Her lungs were clear with no increased respiratory effort. Dr. Roderick Tompkins performed the surgery. Additional vocal cord polyps were found. (Tr. at 388-89).

On April 25, 2006, Claimant underwent an upper GI barium swallow thyroid scan with uptake at KDMC. (Tr. at 390-91). The results indicated a normal upper GI series, as well as a normal barium swallow. (Tr. 391). The following day, Dr. Gregory Baker performed microlaryngoscopy and removal of vocal cord polyps. (Tr. at 392).

Claimant presented to KDMC on April 23, 2008 for phacoemulsification with posterior chamber intraocular lens implantation in the left eye performed by John Gross, M.D. (Tr. at 377-78). Claimant had been experiencing painless, progressive loss of vision in both eyes due to cataracts. Her visual acuity in the left eye had decreased to 20/70, and Claimant reported significant problems, which were heavily impacted the quality of her life. (Tr. at 377). Dr. Gross documented that the surgery went well. Claimant was stable at discharge. (*Id.*).

Claimant presented to the Louisa Medical Clinic on September 9, 2008 with complaints of nasal drainage and coughing. (Tr. at 910). She also reported she choked easily when drinking or eating. A review of systems was positive for chronic nasal congestion, shortness of breath, coughing, wheezing, and depression. Upon examination, Jill Short, Certified Physician's Assistant ("PA"), noted that Claimant's lungs were clear bilaterally with normal respiratory effort, although a few scattered, faint wheezes were present. Claimant's medication included Synthroid, Lexapro, and Estrogen patch. Claimant reported she smoked cigarettes daily and had done so for the past thirty-five years. (*Id.*). A chest x-ray was ordered, which was performed that day. The x-ray revealed that Claimant's heart and lungs were within normal limits. (Tr. at 904).

Claimant returned to KDMC on March 2, 2009 for a barium swallow examination. (Tr. at 899). The results indicated mildly prominent cricopharyngeus, minimal reflux, and mild to minimal tertiary contractions. The examination was unremarkable with normal

emptying of the esophagus. There was no stricture or mucosal irregularity. (*Id.*).

In preparation for a sleep study on March 5, 2009, Claimant reported a medical history of thyroid condition, arthritis, depression, and anxiety. (Tr. at 498). Claimant indicated she had never been diagnosed with a sleep issue; she smoked one to one and one half packs of cigarette each day; and she drank ten to twelve cups, or one pot, of coffee per day. (Tr. at 499). Claimant reported that she was scheduled for a sleep study as she "sleeps all the time." (Tr. ac 503). Two days later, Claimant underwent a diagnostic polysomnography interpretation, which was performed by Drs. Scott Nelson, Gregory Stark, and Iyad Assad. (Tr. at 492-96). The physicians found that Claimant had mild sleep disordered breathing and periodic leg movements. They recommended that she lose weight and exercise; avoid risky behavior (like driving) when drowsy; avoid alcohol and narcotics; keep a regular sleep schedule; and avoid sleep deprivation. (Tr. at 491).

Claimant returned to the Louisa Medical Clinic on March 31, 2009 and saw Dr. Marc Workman. (Tr. at 856). Claimant complained of diffuse joint pain in the knees, hands, and elbows and fatigue. She also reported occasional dysphagia for which she sought treatment with a gastroenterologist. Claimant denied having anxiety or depression. She complained of being chronically hoarse, but admitted that she continued to smoke. (*Id.*). Dr. Workman planned to obtain copies of Claimant's sleep study and check her cardiac enzymes. He instructed Claimant to follow-up with her gastroenterologist.

Claimant presented to KDMC for a second sleep study on April 11, 2009; this time, the study was performed with the use of a CPAP. (Tr. at 477-484). Dr. Nelson interpreted the study as showing sleep fragmentation and a mild sleep disordered breathing that improved with CPAP therapy. He also assessed Claimant with the following conditions:

tobacco abuse, a thyroid condition, arthritis, being overweight, depression, and anxiety. (Tr. at 468). Dr. Nelson discussed sleep hygiene issues with Claimant and suggested behavioral therapy to include weight loss and exercise. Claimant was prescribed CPAP therapy.

Claimant returned to Dr. Workman's office on May 26, 2009. (Tr. at 855). On this visit, Claimant complained of depression and anxiety, and she was assessed with depression with somatic symptoms, pain, and fatigue. Cymbalta was added to Claimant's medication regimen, and the dosage of Lexapro was decreased. The following day, Claimant underwent a pulmonary function test at KDMC. (Tr. at 416). The test confirmed the presence of mild obstructive process, no response to bronchodilators, and mildly reduced diffusion capacity. On June 1, 2009, Dr. Scott Nelson prescribed a CPAP device for obstructive sleep apnea. (Tr. at 466). He believed Claimant's prognosis was good.

On August 5, 2009, Claimant underwent a CT scan of the thorax due to COPD. (Tr. at 425-26). Dr. Stella Powell found a few scattered small pulmonary nodules and a few borderline size lymph nodes within the mediastinum. A three month follow-up was recommended.

On August 24, 2009, Claimant presented to Dr. Workman's office, reporting a decrease in depression with medication. She complained of leg pain, right worse then left, and foot pain. (Tr. at 854). Dr. Workman diagnosed Claimant with depression, which had improved; foot and leg pain; COPD; and hyperlipidemia. At her next visit on December 21, 2009, Claimant was assessed with depression, severe osteoarthritis, and COPD. (Tr. at 852). Her dosage of Lexapro was increased, Celebrex was added to the medication regimen, and Mobic was discontinued.

On April 8, 2011, Claimant underwent laser capsulotomy of the left eye due to

complaints of decreased vision. (Tr. at 960-66). The procedure went well and Claimant was discharged the same day with no restrictions of her activities. (Tr. at 966).

On April 19, 2011, Claimant returned to Louisa Medical Clinic and was seen by PA Short. (Tr. at 850-51). Claimant complained of pain in the anterior left hip which was constant and dull and was not relieved with Celebrex. Claimant had pain on standing, although this improved with movement. She reported taking as many as ten aspirins per day for pain relief. Claimant also complained of muscle spasms in the upper abdomen, which worsened when she bent over. (Tr. at 850). PA Short performed a physical examination of Claimant that was unremarkable, except for tenderness on palpation of the left hip joint and pain with internal rotation of the left hip. However, Claimant was noted to be ambulatory. PA Short assessed Claimant with left hip pain, hypothyroidism, COPD, arthritis, upper abdominal discomfort, and hyperlipidemia. PA Short ordered an x-rays of Claimant's left hip and counseled her about smoking cessation. (Tr. at 851). That same day, Claimant reported to Three Rivers Medical Center for the x-rays. (Tr. at 887). The x-rays revealed mild osteoarthritic change in the bilateral hips, appearing slightly greater on the left. Some areas of lucency were apparent in the subcortical region of the left femoral head; therefore, the possibility of avascular necrosis could not be excluded.

The following month, on May 3, Claimant presented to Our Lady of Bellefonte Hospital ("OLBH") for an MRI of the left hip to investigate the cause of increasing pain in her hip, which radiated into her knee. (Tr. at 787). The MRI showed mild to moderate degenerative changes in the hip joint, a suspected labral tear in the superior labrum, and small joint effusion. (Tr. at 788).

On May 4, 2011, Claimant underwent cataract removal with implantation of posterior chamber intraocular lens in the right eye, performed by Dr. Maurice Oakley.

(Tr. at 944). Dr. Oakley noted Claimant's visual acuity had been steadily decreasing in that eye. Claimant's pre-operative visual acuity was 20/80 with full correction, but decreased to 20/400 with glare. The procedure went well, and Claimant was discharged in good condition with no complaints of pain. (Tr. at 950).

Claimant presented to Michael Goodwin, M.D., on May 19, 2011 for severe left hip pain ongoing for one year. (Tr. at 738, 749-50). Claimant told Dr. Goodwin she took aspirin and Ultram for pain, but Ultram offered no relief. She also said the pain worsened when getting out of a chair, walking, and sitting. Claimant's medical history included arthritis, stomach issues, and COPD. Dr. Goodwin noted that Claimant continued to smoke one and one half packs of cigarettes each day. On examination, Claimant had severe pain with range of motion of the left hip. Flexion was measured to one hundred and internal rotation measured twenty with significant pain. External rotation was at forty and painful. Claimant had full extension, abduction to thirty and painful adduction at ten to fifteen. There was no significant pain with rotation to the right hip. Dr. Goodwin diagnosed significant osteoarthritis of the left hip and recommended a total hip replacement. (*Id).*

Claimant returned to Louisa Medical Clinic on June 9, 2011 for follow-up. (Tr. at 849). She complained of pain in her left hip, and indicated that she was scheduled for hip replacement surgery in August. She reported taking over-the-counter pain relievers three times per day and felt that they worked better than any other arthritis medicine she had taken in the past. Her reflux symptoms were gone, and she had no abdominal pain as long as she took Nexium and Zantac. In addition, Claimant indicated that she was doing well post-cataract surgery. Claimant was in no apparent distress. Her physical examination was unremarkable, except for tenderness on palpation of the left hip. Nonetheless,

14

Claimant was observed to walk without difficulty.

Claimant returned to Louisa Medical Clinic on August 4, 2011 and was seen by PA Short. Claimant complained of break-through pain in her hip joint; however, she was scheduled for hip replacement in a couple of weeks. (Tr. at 842-43.). Claimant was in no apparent distress, but her hip joint was tender on palpation. PA Short assessed Claimant with uncontrolled hypertension, tobacco abuse with COPD, severe osteoarthritis of left hip, and hyperlipidemia. (*Id.*).

On August 17, 2011, Claimant underwent left total hip replacement performed by Dr. Goodwin. (Tr. at 758-62). Dr. Goodwin noted in the preoperative examination that x-rays of the left hip revealed severe osteoarthritis with bone on bone contact. He diagnosed end stage osteoarthritis of the left hip. (Tr. at 674). Claimant tolerated the procedure well. (Tr. at 758). The following day, she was seen by Julie Browning, P.T., for an initial physical therapy evaluation. (Tr. at 526). Based on the evaluation, Ms. Browning recommended physical therapy twice daily during the hospital admission. Dr. Goodwin discharged Claimant on August 19, 2011. (Tr. at 548). He noted that she was doing reasonably well and would receive home health physical therapy three times per week.

Claimant presented to the Emergency Department at OLBH on September 6, 2011 with complaints of left ankle edema. (Tr. at 696). Claimant reported that her left ankle, calf, and leg had been edematous ever since her hip replacement, making it difficult for her to walk. She also complained of moderate pain in the left foot and ankle accompanied by stiffness. (Tr. at 697). On examination, Claimant displayed no nervousness or anxiety, and her mood and affect were normal, as was her judgment and thought content. (Tr. at 699-700). She had decreased range of motion of the left ankle, but no ecchymosis, deformity, or tenderness.  (Tr. at 700). An ultrasound of the lower extremity was negative

with no evidence of deep vein thrombosis. (Tr. at 701, 706). She was discharged with instructions to return if her symptoms worsened. (Tr. at 708).

Dr. Goodwin examined Claimant one week later, on September 13, 2011, and documented that her surgical wounds were healing well. (Tr. at 737). X-rays showed the left hip to be in adequate position. (Tr. at 737). She was prescribed Lorcet and a Jobst stocking and was instructed to return in three to four weeks.

Claimant returned to Louisa Medical Clinic on September 26, 2011 for regular follow-up. (Tr. at 848). She indicated that the pain in her left hip had resolved post hip replacement; however, she now had discomfort in both knees. (Tr. at 848). Claimant continued to smoke. Her reflux symptoms were controlled with medication. She was observed to be ambulating with the use of a hand cane and appeared in no acute distress. She had good range of motion of all extremities without limitations. (*Id.*).

On October 11, 2011, Claimant presented to Dr. Goodwin for follow-up. (Tr. at 737). She complained of left knee pain, but had no major swelling and demonstrated good range of motion. Dr. Goodwin did not find any significant problem with Claimant's left knee. He nevertheless administered an injection of Marcaine, Xylocaine, and Kenalog into Claimant knee and suggested that she work on range of motion and strengthening. (*Id.*). At her next appointment on November 22, 2011, Claimant reported that her hip pain was improved, but she continued to have left knee discomfort. Dr. Goodwin observed mild swelling and tenderness in the knee medially. X-rays showed only minimal osteoarthritis, so he decided to order an MRI to rule out a meniscal tear. (*Id.*). The MRI was performed on December 20, 2011 at OLBH. (Tr. at 740). The radiologist found a probable small Baker's cyst and a small effusion. Claimant's ACL and PCL were observed to be intact, and there was no definite meniscal tear. There was some irregularity of the medial articular

16

cartilage which was thought to be chondromalacia. However, no osteochondral defect or bone marrow edema seen, and the collateral ligaments were intact. (*Id.*).

Dr. Goodwin reviewed the MRI results with Claimant on December 29, 2011, explaining that there was significant patellofemoral arthritis and moderate effusion of the left knee. (Tr. at 736). Claimant's right knee had become significantly swollen and showed 3-4+ effusion; however, the stability was good, the range of motion was not too painful, and the knee was not warm to the touch. Her left knee did not reflect major effusion but did display crepitus. Claimant had no pain on examination of her left hip. Claimant received an injection to her right knee and was scheduled to receive another one in the left knee at a later date. On January 26, 2012, Claimant returned to Dr. Goodwin for a Synvisc One injection to her left knee. (*Id.*)

On March 15, 2012, Claimant was seen by PA Short at the Louisa Medical Clinic. (Tr. at 838-40). Claimant stated that she had returned to work after her hip replacement, but felt exhausted all of the time. She admitted feeling depressed. (Tr. at 838). Claimant also complained of severe knee pain that radiated down her legs. On examination, PA Short documented that Claimant demonstrated good range of motion of all extremities, without pretibial pitting edema or calf tenderness. (Tr. at 839). Claimant reported having syncopal episodes secondary to coughing, so a chest x-ray was ordered. Claimant was advised she needed to stop smoking. She was prescribed Advair, Spiriva Handihaler, and Ventolin HFA inhaler. PA Short added Abilify to Claimant's medications and told her to discontinue Celexa, but continue taking Cymbalta.

Claimant underwent a chest x-ray, bilateral lower extremity duplex Doppler arterial examination, and bilateral carotid duplex scan on March 21, 2012. The chest x-ray showed normal heart and lungs. (Tr. at 813). The bilateral lower extremity duplex

Doppler arterial examination showed no evidence of a hemodynamically significant right or left lower extremity arterial stenosis. (Tr. at 863). The bilateral carotid duplex scan revealed mild bilateral internal carotid artery stenosis of less than thirty percent diameter. Both vertebral arteries were patent with antegrade flow. (Tr. at 864).

Claimant returned to Louisa Medical Clinic on March 28, 2012 and reported to PA Short that her depression was much improved with the addition of Abilify. (Tr. at 834). Claimant continued to cough with intermittent episodes of syncope; however, she "had no desire" to stop smoking. Claimant reported that her legs bothered her constantly, but Dr. Goodwin did not feel she needed knee replacements yet. Her physical examination was unremarkable. She had good range of motion of all extremities and was in no apparent distress. (Tr. at 835). Claimant's medication regimen was continued. (Tr. at 836).

**B.  Treatment Records after April 13, 2012 (Alleged Disability Onset)**

On April 26, 2012, Claimant called PA Short at Louisa Medical Clinic reporting a death in the family and requesting "something for anxiety." (Tr. at 833). A prescription for Ativan 0.5 mg with no refills was provided.

Claimant returned to Louisa Medical Clinic on May 24, 2012 and was seen by Dr. Workman. (Tr. at 830-32). Claimant complained of pain in both knees and reported that she had received some temporary relief with steroid injections. Claimant also indicated that Dr. Goodwin had ordered an MRI of her knees, but the films did not show enough osteoarthritis to justify joint replacements. Claimant also described having recurrent episodes of syncope with coughing. (Tr. at 830). An examination of Claimant's knees revealed no significant crepitus, but she reported pain upon flexion and extension. (Tr. at 831). Claimant was assessed with bilateral knee pain with mild degenerative arthritis and

significant weakness; recurrent syncope episodes with coughing; fairly controlled hypertension; and stable depression. Dr. Workman prescribed physical therapy to help strengthen Claimant's knees and ordered a thirty-day event recorder to monitor for cardiac arrhythmia.

Claimant returned to Louisa Medical Clinic two more times in 2012. On August 14, Claimant reported that physical therapy had helped strengthen her knees, and she was continuing therapy on her own. (Tr. at 827). Claimant was no longer taking Cymbalta as she could not afford it; however, she had not experienced syncopal episodes since discontinuing the medication. Claimant reported increased depression and asked to try an additional medication. A physical examination revealed mild pain with flexion/extension of the knees, but was otherwise unremarkable. (Tr. at 828). Dr. Workman prescribed Effexor for depression and encouraged smoking cessation in light of Claimant's COPD.

On November 21, Claimant reported continued depression with crying episodes and feelings of not wanting "to do anything." (Tr. at 824). PA Short noted that Claimant had been laid off at work, and her unemployment benefits had ceased, making it difficult for her to afford her medication. She had enrolled in the drug assistance program, but had not yet received the right doses of medication. Claimant had been out of her antihypertensive medication for two weeks, and her blood pressure was significantly elevated at 162/110. (Tr. at 824-25). Claimant had stopped wearing the CPAP three months earlier. (Tr. at 825). On examination, Claimant was in no apparent distress. She had no pretibial pitting edema or calf tenderness, and she exhibited good range of motion in all extremities without limitations. (Tr. at 825-26). PA Short discontinued Effexor due to its cost and prescribed Prozac 20 mg for depression. Claimant was going to request

19

Abilify through the drug assistance program as that medication had worked well for her in the past. Claimant was also prescribed Lisinopril and told to come to the clinic for weekly blood pressure checks. PA Short felt Claimant was overdue for a thyroid test, noting that hypothyroidism might be contributing to her depression. (Tr. at 826).

Claimant returned to Louisa Medical Clinic three times in 2013. (821-23, 996-98, 993-95). On January 15, Claimant stated that she continued to be depressed, despite taking Prozac and Abilify. (Tr. at 821). Claimant told PA Short that Cymbalta worked better, but gave her "seizures." She indicated that she no longer received unemployment payments and was considering applying for disability. On examination, Claimant's blood pressure measured 124/70 and she was in no apparent distress. (Tr. at 822). She exhibited good range of motion in all extremities without limitations. (Tr. at 823). PA Short increased the dose of Prozac to 40 mg a day and Abilify to 10 mg daily. She recommended counseling; however, Claimant declined due to the cost. Her hypertension was stable, and she was again encouraged to stop smoking.

On July 29, Claimant continued to complain of persistent depression, reporting that Prozac did not help and made her sleepy. (Tr. at 996) Claimant continued to smoke and had stopped taking Spiriva as she felt it was not helping. She complained of chronic pain in the hips, especially the right, and in her knees and low back. She also reported numbness and tingling in her hands. Claimant told Dr. Workman that she took three Tylenol 500 mg tablets every four hours for pain. Claimant's physical examination revealed good range of motion in all extremities without limitation. The dorsalis pedis was 2+ and equal. Posterior tibial pulses were decreased bilaterally, but her feet were warm to the touch. (Tr. at 998). Claimant's hypertension was well-controlled on Zestoretic. She was continued on Synthroid and given samples of Viibyrd for depression.

Dr. Workman referred Claimant for counseling. He also prescribed Lorcet for diffuse osteoarthritis.

Claimant returned on August 26, 2013 stating that Viibryd helped reduce her depression. (Tr. at 993). Claimant started counseling and had attended two sessions. She continued to smoke against medical advice. Claimant's physical examination was unremarkable. She was again encouraged to stop smoking. (Tr. at 995).

On March 28, 2014, Claimant presented to KDMC for a MRI of the lumbar spine ordered by PA Short. (Tr. at 1006-07). The MRI showed multilevel degenerative disc disease and multilevel facet arthropathy.

On April 7, 2014, Claimant returned to Louisa Medical Clinic and saw PA Short. Claimant complained of severe pain in her knees and hips. (Tr. at 990-92). She reported that she could only lie down at night for one to two hours and would then have to get up due to pain and sit in a recliner or move around. Claimant also said she felt stiff all day. Claimant continued to smoke a pack of cigarettes per day. Her depression had improved, although she had stopped going to counseling due to transportation issues. In any event, she indicated that she did not think counseling was necessary. Claimant's physical examination was unremarkable, except for crepitations on flexion and extension of the knee joints. However, she had good range of motion in all extremities without limitation. (Tr. at 992). PA Short provided Claimant with a prescription for physical therapy due to complaints of chronic low back pain. (Tr. at 978).

On April 15, 2014, Claimant presented to Three Rivers Physical Therapy for an initial evaluation. (Tr. at 978, 984). She complained of low back pain for several years, which had worsened in the last year. (Tr. at 984). She also had severe knee pain and, although she used to be independent with activities of daily living, she stated that walking

and sitting for any length of time had become painful. Claimant also reported that she could not bend or lift. The therapist observed that Claimant had a sway back and a scoliosis curve of the lumbar spine with apex to the right. Claimant remained forward flexed. She had mild joint effusion in the knees, with the right worse than left. On physical examination, Claimant was noted to have decreased vertebral movement. She had 2+ tenderness at L5-S1 facets, and 3+ tenderness at L5 with posterior glide. There was no sign of muscle strain. Claimant was limited in forward bend, but was able to get her fingers seven inches from the floor. On right side bend, her fingers were twenty-two inches from the floor, and on the left side, they measured eighteen inches from the floor. Her back extension was sixty percent of normal. (Tr. at 985). Claimant had minus 4/5 strength in her hips and legs bilaterally. Her endurance was poor plus. She was unable to stand from a sitting position without using her arms. Her core was 3+/5 grossly. Regarding mobility, steps were difficult for Claimant. Her gait was slow and guarded with increased pain after walking two hundred feet. Claimant sometime felt tingling in her feet, although no parathesia. Light touch was intact and symmetrical. Deep tendon reflexes were 2+ bilaterally. Claimant was assessed as being very weak, flexed forward, and showing signs of degenerative disc and joint disease of the spine. The therapist believed Claimant would improve her strength and obtain better posture and modalities if she was compliant with therapy. Two sessions of physical therapy per week was recommended for a period of four weeks.

On April 21, 2014, Claimant presented to Three Rivers Medical Center for x-rays of the chest, bilateral knees, and right hip. (969, 970-71, 1000-02). The chest x-ray showed clear lungs and normal heart size with no acute disease. (Tr. at 1000). The right knee x-ray revealed mild marginal osteophyte formation of the medial compartment and

small joint effusion. (Tr. at 1001). The left knee x-ray showed mild marginal osteophyte formation of all three compartments; however, there was no bone or joint abnormality. X-ray of the right hip showed mild osteoarthritis of the right hip joint. There was no evidence of acute fracture or dislocation. (Tr. at 1002).

On May 6, 2014, Claimant canceled her physical therapy appointment. (Tr. at 981). On May 19, Claimant was discharged from physical therapy for noncompliance, as she had not rescheduled her appointment and had not met any of the initial evaluation goals. (Tr. at 980).

### C. Evaluations and Opinions

On March 30, 2013, P. Saranga, M.D., completed a Physical Residual Functional Capacity Assessment form. (Tr. at 100-102). Dr. Saranga found that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight hour work day; and sit about six hours in an eight hour work day. Claimant had unlimited ability to push and/or pull. (Tr. at 100). Dr. Saranga based these opinions on Claimant's history of left total hip replacement with an examination in 2013 showing that Claimant was doing well. Additionally, he noted Claimant had left knee chondromalacia with effusion in 2011 and had synovic injections performed in 2012. She suffered from COPD, but without frequent exacerbations. Although the record indicated hypertension with syncope episodes, Dr. Saranga found no evidence of falls or seizures, and Claimant's blood pressure was controlled. As to postural limitations, he felt that Claimant could frequently balance, stoop, kneel and crawl, and climb ramps and stairs, and could occasionally crouch and climb ladders, ropes, and scaffolds. (Tr. at 100-01). Dr. Saranga found Claimant had no manipulative, visual, or communicative limitations. (Tr. at 101). However, she needed to avoid concentrated

exposure to extreme cold, vibration, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. (Tr. at 101). Dr. Saranga considered Claimant's alleged limitations in lifting, squatting, bending, standing, reaching, walking, sitting, and climbing stairs, but he found her statements to be only partially credible as the medical records documented that she had a normal gait and, in 2013, she had normal range of motion. (Tr. at 101-02).

On April 2, 2013, Megan L. Green, Psy.D., performed a psychosocial evaluation of Claimant at the request of the SSA. (Tr. at 913-16). Claimant told Dr. Green that she was raised in Louisa, Kentucky and had a normal childhood, without any history of abuse or neglect. She had never married and lived alone in Louisa. Claimant had two brothers and one son. She described having good family support and maintained close relationships with her brothers, her son, and some of her cousins. Claimant also had friends at church and attended services regularly. (Tr. at 913). Claimant reported being a Sunday school teacher which was "easy for her," but stated it sometimes was "not worth getting ready and going." (*Id.*). With respect to her educational background, Claimant reported that she had completed two years of college and had no history of learning disabilities. (Tr. at 914). Claimant was previously employed as a clerical worker until April 2012 when she was "laid off" and her father became ill. After tending to him for a month, she began having trouble with her spine and "couldn't go back" to her prior employment, where she had to frequently walk up and down stairs. Nonetheless, Claimant conceded that she was generally capable of completing occupational tasks from a "mental health perspective." (Tr. at 914). She reported that she had been treated "on and off" for depression since her teenage years and was currently taking Prozac and Abilify, but she had never been hospitalized for a psychiatric illness. Claimant described her daily activities as sitting and

watching television, doing bible study, and taking naps. She maintained personal hygiene, but typically did not complete household chores or shopping.

Dr. Green performed a mental status examination of Claimant. Claimant was alert and oriented in all spheres, cooperative, friendly, and appropriately dressed. Claimant's thought process, thought content, and psychomotor activity were all unremarkable. (Tr. at 914-15). However, her mood was depressed. (Tr. at 915). Claimant displayed an appropriate affect; her insight and judgment were adequate; her intelligence was average; her attention and concentration were intact; and her remote, short term, and immediate memory were normal.

Claimant reported a lack of desire to do anything and found it "easier to take a nap and sleep," stating that she did not have the energy to clean her house. Claimant denied participating in recreational or social activities, but did attend church regularly and taught Sunday school. Claimant described feeling sad all of the time and had crying spells once per week. She also experienced sleep disturbances due to pain. Claimant stated that she used a CPAP machine and needed to get up and move around at night.

Dr. Green diagnosed Claimant with depressive disorder, not otherwise specified, and gave Claimant a Global Assessment of Functioning score of 65.[1] Dr. Green found Claimant was capable of managing her own benefits. Her prognosis was fair based upon

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 34 (4th ed. text rev. 2000) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

the severity of her symptoms. Dr. Green opined that Claimant's depression was mild, and she retained the ability to understand, remember, and carry out instructions. Dr. Green also believed that Claimant was capable of responding appropriately to supervision and sustaining adequate concentration, persistence, and pace. She was likely able to adapt to work-place changes, as well. (Tr. at 916).

On April 8, 2013, Ellen Shapiro, Ph.D., completed a Psychiatric Review Technique from. (Tr. at 98-99). Dr. Shapiro found Claimant to have a medically determinable impairment that did not precisely satisfy the diagnostic criteria of an affective disorder. (Tr. at 98). Dr. Shapiro opined that Claimant had mild limitations in activities of daily living and in maintaining concentration, persistence and pace. She had no limitations in maintaining social function and no episodes of decompensation. There was no evidence of paragraph "C" criteria.

Under the section entitled "Additional Explanation," Dr. Shapiro noted that Claimant's activities of daily living included driving, going out alone, shopping, socializing, and handling finances. Claimant had no apparent problems with following instructions, was not bothered by change, and got along well with others. (*Id.*). Dr. Shapiro found Claimant to be credible. Dr. Shapiro felt that Dr. Green's evaluation and statements were entitled to great weight because they were consistent with other information in the record and were based upon sufficiently detailed mental status observations. Dr. Shapiro opined that Claimant's mental impairments, by themselves, created only mild limitations across all functional domains, and the preponderance of the evidence indicated that the impairments did not meet or equal any listed impairment. Consequently, Dr. Shapiro found the impairments to be non-severe. (*Id.*).

On June 19, 2013, Mary K. Thompson, Ph.D., provided a second review of

Claimant's file. She opined that Claimant's activities of daily living indicated mild mental restrictions. (Tr. at 124-25). Dr. Thompson found Claimant's statements were fully credible and were consistent with a non-severe mental impairment. Dr. Thompson further opined that Dr. Green's opinion was entitled to great weight as it was supported by the record. She also affirmed the opinions expressed by Dr. Shapiro, as written. (Tr. at 125).

On June 27, 2013, Alex Guerrero, M.D., reviewed the opinions of Dr. Saranga and affirmed them with some modifications. (Tr. at 138-40). Dr. Guerrero found that Claimant could frequently climb ramps and stairs and balance, but could only occasionally stoop, kneel, crouch or crawl. He felt Claimant should never climb ladders, ropes, or scaffolds. (Tr. at 139). Dr. Guerrero based his opinions on Claimant's history of left hip replacement and degenerative joint disease of the knee. (Tr. at 139). He found Claimant had no manipulative, visual, or communicative limitations. As to environmental limitations, Dr. Guerrero opined that Claimant needed to avoid concentrated exposure to extreme cold, humidity, vibration, fumes, odors, dusts, gases, poor ventilation and she should avoid all exposure to hazards such as machinery and heights. (Tr. at 138-40). Dr. Guerrero supported his conclusions by citing Claimant's allegations that she was limited in her ability to lift, squat, kneel, bend, stand, reach, walk, sit, kneel or climb stairs. However, when comparing the statements with the medical records, Dr. Guerrero found Claimant to be only partially credible. (Tr. at 140).

## VI.  <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.  Discussion**

As previously stated, Claimant takes issue with the ALJ's evaluation of her mental impairments and with the ALJ's hypothetical questions to the vocational expert. Each of the challenges will be addressed in turn.

**A.  Severity of Mental Impairments**

At the second step of the sequential evaluation process, the ALJ must examine the claimant's alleged impairments to determine which, if any, of them are severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that

has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, remembering simple instructions, understanding simple instructions, carrying out simple instructions, using judgment, interacting appropriately with co-workers, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Here, the ALJ found that Claimant had severe impairments of "osteoarthritis of

the hip, status-post left hip replacement; degenerative joint disease of the knees; degenerative changes of the lumbar spine; and chronic obstructive pulmonary disease." (Tr. at 14). Accordingly, the sequential process proceeded to step three. From that perspective, even if the ALJ erred by not considering Claimant's mental impairments to be severe, Claimant suffered no harm because the outcome at step two was the same: her applications for benefits moved on to the next step in the sequence. Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W.Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W.Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate

30

any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."); A number of federal courts of appeals have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

In addition to a lack of prejudice to Claimant flowing from the ALJ's step two findings, Claimant's challenge is unpersuasive in light of substantial evidence supporting the ALJ's conclusion that Claimant's mental impairment was non-severe. The ALJ correctly evaluated the effects of Claimant's depression, using the four broad functional areas designated as paragraph "b" criteria. The ALJ determined that Claimant had only mild limitations in activities of daily living. The ALJ noted that Claimant was able to attend to her personal needs independently, did household chores, and had a driver's license. (Tr. at 15). Indeed, Claimant lived alone and essentially took care of herself without assistance. While she testified that she required help with cleaning her bathroom, she explained that this was necessary due to her back pain, rather than due to any psychological issue.

The ALJ next found that Claimant had no limitation in her ability to maintain social functioning. (Tr. at 15). The ALJ pointed out that Claimant attended church two or three times per week, played the piano at church, and taught Sunday school. In addition, the record reflects that Claimant had close relationships with her son, siblings, and

cousins, and she admitted to having no problems getting along with others. With respect to concentration, persistence, and pace, Claimant had a mild limitation. She watched television regularly, although she claimed to lose attention after approximately thirty minutes. (*Id.*). However, she prepared lesson plans for Sunday school and played the piano at church by memory and with sheet music. Claimant had no history of episodes of decompensation. Consequently, with no more than mild limitations in two of the first three functional areas, no limitations in the third area, and no episodes of decompensation, the ALJ properly concluded that Claimant's mental impairments were not severe.

As part of this challenge, Claimant argues that the ALJ did not properly weigh the medical source opinions. According to Claimant, the ALJ should have given more weight to the medical records from the Louisa Medical Clinic, which allegedly substantiated Claimant's allegations of long-standing depression with frequent crying spells, and which reflected Claimant's repeated reports that she lacked the desire to engage in her prior activities. (ECF No. 10 at 7). Claimant argues that instead of accepting the findings of Claimant treating health care providers, the ALJ relied on the opinions of non-examining sources and a one-time evaluation by Dr. Green.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§

404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6),[2] and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic

---

[2] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[3] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Here, Claimant's treating physicians made no statements concerning the extent or severity of Claimant's mental impairments, or their functional effect on her ability to do basic work functions. Therefore, the ALJ reviewed the evidence and addressed the opinions offered by the consulting sources. Contrary to Claimant's contention that the ALJ gave more weight to the sources' opinions than to the medical record, the ALJ thoroughly reviewed and discussed the medical evidence. Because much of the evidence regarding Claimant's mental distress was based on her subjective reports, the ALJ evaluated the credibility of Claimant's allegations regarding the limiting effects of her symptoms. The ALJ concluded that Claimant was not entirely credible for a variety of reasons. (Tr. at 19-20). For example, the ALJ noted that although Claimant stated that she could not concentrate, she admitted that she was able to teach a thirty-minute Sunday school class, prepare a lesson plan in advance, and play the piano both by memory and with sheet music. Moreover, despite complaining of significant breathing problems, Claimant continued to smoke a considerable number of cigarettes every day and refused to stop smoking. The ALJ further observed that even with her health problems, Claimant

continued to work until she was laid off, and her father became ill. The ALJ remarked that Claimant gave inconsistent testimony about her reasons for leaving her job. Moreover, Claimant received unemployment benefits during the alleged period of disability, which undermined her credibility. The ALJ also pointed out that Claimant's depression decreased with the use of medication and increased when she was not taking her prescriptions. However, even when her symptoms were allegedly at their worse, Claimant had never been hospitalized for a psychiatric illness or condition.

The ALJ then addressed the weight of the opinions offered by the agency consultants. (Tr. at 20-21). The ALJ concluded that although Dr. Shapiro and Dr. Thompson were non-examining consultants, their opinions were entitled to significant weight because they (1) were based upon a comprehensive review of the evidence; (2) were internally consistent; (3) were well-supported by the evidence and by reasonable explanations; and (4) were issued by medical sources with a good understanding of Social Security rules and regulations. (Tr. at 20). The ALJ also gave Dr. Green's consultative examination great weight, because it was based upon a thorough examination and was not inconsistent with any other evidence of record. (Tr. at 21). As previously stated, the ALJ did not specifically weigh opinions by Dr. Workman or PA Short from the Louisa Medical Clinic, because they provided no opinions regarding the limiting effects of Claimant's depression.

In summary, while Claimant disagrees with the ALJ's conclusion about the severity of her mental impairments, she fails to demonstrate that the ALJ reached that conclusion improperly or without a substantial basis in the record. Claimant incorrectly presumes that a long-standing history of depression automatically constitutes a severe impairment. However, the mere presence of depressive symptoms is not enough to prove the presence

of a severe impairment. Instead, the critical measure is the extent to which the symptoms limit the claimant's ability to do work-related activities. The ALJ conducted a thorough analysis of the evidence in that regard and reached a determination supported by all of the medical sources who provided opinions on the issue. Accordingly, the undersigned **FINDS** that the ALJ did not err in her finding that Claimant's mental impairment was not severe.

### B. RFC and Hypothetical Questions

In her second challenge, Claimant alleges that the ALJ's finding at the fourth step of the sequential process was erroneous, because it relied upon opinions by a vocational expert that were made in response to inadequate hypothetical questions. Specifically, Claimant maintains that the ALJ failed to properly incorporate Claimant's limited ability to bend, sit, stand, and walk in the RFC finding and, consequently, in the hypothetical questions.

Although couched as an indictment of the vocational expert's opinions, this challenge is more aptly seen as an attack on the accuracy of the ALJ's RFC determination. Having reviewed the ALJ's RFC analysis, the undersigned **FINDS** Claimant's challenge to be unpersuasive. Contrary to Claimant's contention, the ALJ included limitations in the RFC finding to account for Claimant's restricted ability to bend, sit, stand, and walk; at least, to the extent that they were established in the record. (Tr. at 16). Indeed, the ALJ explicitly found that Claimant could only occasionally[4] stoop, kneel, crouch, and crawl, all of which are forms of bending. *See Coeburn v. Astrue*, No. 2:09CV00062, 2010 WL

---

[4] According to the RFC assessment form, "occasionally" means one third or less of an eight-hour workday. (Tr. at 112).

2925994, at *5 (W.D. Va. July 22, 2010) (citing SSR 85-15).[5] Furthermore, the ALJ determined that Claimant could only sit, stand, and walk six hours each out of an eight-hour workday. In view of the restrictions apparent in the RFC finding, the underlying factual premise of Claimant's argument is flawed.

Residual functional capacity is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the **_most_** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. _Id._ SSR 96-8p provides guidance on how an ALJ should determine a claimant's RFC. According to the Ruling, the ALJ's RFC analysis requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." _Id._ at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." _Id._ Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that

---

[5] _"Stooping, kneeling, crouching, and crawling_ are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending." SSR 85-15, 1985 WL 56857, at *7 (S.S.A. 1985).

he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. A proper RFC assessment requires the ALJ to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (e.g. 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.

Moreover, in considering allegations of symptoms such as pain, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate"; 2) "include a resolution of any inconsistencies in the evidence as a whole"; and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* The ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the ALJ "must always consider and address medical source opinions" in assessing the Claimant's RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

A review of the ALJ's written decision demonstrates that she generally met the

requirements of SSR 96-8p in evaluating Claimant's RFC. To be sure, Claimant provides few specific criticisms of the manner in which the ALJ addressed the evidence. Rather than pointing to errors in the *process* used by the ALJ, Claimant's challenge is primarily to the *outcome* of the analysis. However, when reviewing the RFC finding in this case, the undersigned bears in mind that it is neither tasked, nor authorized, to conduct a *de novo* review of the evidence. Moreover, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, regardless of whether the Court agrees or disagrees with the decision. The burden on the ALJ to meet the "substantial evidence" bar is not particularly heavy as substantial evidence is defined as more than a scintilla, but less than a preponderance, of the evidence of record.

Here, the ALJ reviewed the evidence and the medical source statements in determining Claimant's RFC. The ALJ accepted most of the opinions offered by Dr. Saranga, because they were well-supported by the objective evidence, were consistent with the record, and were based on a thorough review of the evidence. (Tr. at 44). Dr. Saranga considered the medical notes generated by the health care providers, including those at the Louisa Medical Clinic; Claimant's history of osteoarthritis of the hip; the existence of chondromalacia in her knees; and Claimant's other symptoms and complaints. Dr. Saranga commented that Claimant had received hip replacement surgery, which was successful, and had a series of injections in her knees. Taking all of the evidence into account, Dr. Saranga found that Claimant's ability to bend at the knees (crouch) was limited to "occasionally," but her ability to kneel, crawl, and bend at the waist (stoop) was greater, thus they were limited to "frequently." Additionally, Dr. Saranga did not accept Claimant's statements about her inability to sit, stand, and walk as being entirely credible, because they were contradicted by other evidence in the record. Therefore, despite

Claimant's statements that she was unable to sit, stand, and walk, Dr. Saranga opined that Claimant could sit, stand, and walk as much as six hours, each, in an eight-hour workday.

Six months after Dr. Saranga's assessment, Dr. Guerrero conducted a second review of the evidence and completed a physical RFC evaluation. Having the benefit of additional treatment records, Dr. Guerrero felt that Claimant was more restricted in her ability to stoop, kneel, and crawl than was determined by Dr. Saranga. However, even with the additional evidence, Dr. Guerrero agreed with Dr. Saranga that Claimant could sit, stand, and walk six hours, each, in an eight-hour workday. The ALJ acknowledged that Dr. Guerrero had more evidence available to him when he performed his evaluation; therefore, the ALJ decided to give Claimant the benefit of the doubt and accepted Dr. Guerrero's more restrictive opinions. As such, the ALJ limited Claimant to only occasional stooping, kneeling, crouching and crawling. (Tr. at 39). The ALJ adopted both experts' opinions about the extent of Claimant's limitations in sitting, standing, and walking.

In addition to the expert opinions, the ALJ identified other significant evidence that informed her RFC finding. The ALJ explicitly stated that she did not find Claimant to be completely credible as many of her statements were inconsistent with the evidence. (Tr. at 19). The ALJ emphasized that Claimant's diagnostic tests revealed relatively minor degenerative changes in her hip, knee, and spine. (Tr. at 20). Furthermore, Claimant had reported that her pain decreased with physical therapy and knee injections.

While Claimant offers little more than her own statements to bolster her argument that her limitations are more severe than reflected by the RFC finding, the ALJ based her RFC finding on the record, her credibility assessments, and the well-supported and consistent opinions of medical experts with knowledge of Social Security rules and regulations. Thus, the undersigned finds that the ALJ's RFC determination is supported

by substantial evidence, and further **FINDS** that the hypothetical questions posed by the ALJ to the vocational expert, which incorporated the RFC finding, were proper. Therefore, the ALJ did not err by relying on the opinion of the vocational expert that Claimant could perform past relevant work.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 11), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727

F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  December 11, 2015

Cheryl A. Eifert
United States Magistrate Judge

42